EL SOURI v DEPARTMENT OF SOCIAL SERVICES

Docket No. 78544. Argued May 5, 1987 (Calendar No. 8). Decided
    October 23, 1987.

Metri El Souri, his wife, and their three children, who are legal
    resident aliens, were denied general assistance benefits by the
    Department of Social Services on the basis of its policy of
    considering a sponsor's income and assets in determining an
    alien's eligibility. Following a hearing, the referee affirmed the
    denial, finding that the claimants were not denied public assis-
    tance on the basis of being resident aliens, but on the basis of
    the excess income of their sponsor. The Ingham Circuit Court,
    James R. Giddings, J., reversed, finding that the policy violated
    the Equal Protection Clause of the Fourteenth Amendment and
    Const 1963, art 10, § 6. The Court of Appeals, D. E. HOLBROOK,
    JR., P.J., and T. M. BURNS and HOOD, JJ., affirmed on the basis
    of the Fourteenth Amendment, but did not address the alleged
    violation of the Michigan Constitution (Docket No. 82177). The
    department appeals.

    In a unanimous opinion by Justice GRIFFIN, the Supreme
    Court held:

    The Department of Social Services policy under which excess
    income of an alien's sponsor is deemed to be income of the
    alien without regard to whether the income is actually avail-
    able creates a classification based on alienage, violative of the
    equal protection provisions of the Fourteenth Amendment.

    1. The Fourteenth Amendment reflects an elementary limita-
    tion on state power. It provides that no state may deny to any
    person within its jurisdiction the equal protection of the laws,
    and directs that all persons similarly circumstanced be treated
    alike. Classifications which disadvantage a suspect class are
    presumed invidious and are subject to close judicial scrutiny.
    The United States Supreme Court has determined that where,
    as in this case, a state or local law classifies a person on the
    basis of alienage for the purpose of distributing economic

REFERENCES
Am Jur 2d, Welfare Laws §§ 1 et seq.
Constitutionality of state welfare programs, including those which
    are federally assisted—Supreme Court cases. 25 L Ed 2d 907.

benefits, the law is inherently suspect and is to be subjected to strict judicial scrutiny.

2. In undertaking strict judicial scrutiny, the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial and whether the means adopted to achieve the goal are necessary and precisely drawn.

3. In this case, the goal of conserving scarce economic resources for persons most in need, in and of itself, is insufficient to justify discrimination on the basis of alienage. States do not have the same power as the federal government with regard to the control and categorization of resident aliens. The means adopted by the DSS to achieve its goal were not shown to be necessary or precisely drawn. The policy cannot withstand close scrutiny because of the way it affects resident aliens only, without regard to their actual financial condition.

Affirmed.

150 Mich App 380; 388 NW2d 702 (1986) affirmed.

1. SOCIAL SERVICES — WELFARE BENEFITS — ALIENS — CONSTITUTIONAL LAW.

The Department of Social Services policy under which excess income of an alien's sponsor is deemed to be income of the alien without regard to whether the income is actually available creates a classification based on alienage, violative of the equal protection provisions of the Fourteenth Amendment (US Const, Am XIV).

2. SOCIAL SERVICES — WELFARE BENEFITS — ALIENS — STANDARD OF SCRUTINY.

A state or local law which classifies a person on the basis of alienage for the purpose of distributing economic benefits is inherently suspect and is to be subjected to strict judicial scrutiny (US Const, Am XIV).

Legal Aid of Central Michigan (by *Paula M. Zimmer* and *Daniel Bambery*) for the plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Erica Weiss Marsden,* Assistant Attorney General, for the defendant.

GRIFFIN, J. We are asked in this case to deter-

mine whether a state agency's policy concerning eligibility for welfare benefits creates a classification based on alienage, and, if so, whether the classification violates the equal protection provision of the Fourteenth Amendment of the United States Constitution. We answer in the affirmative with respect to each issue.

I

This suit arises from the denial by the Department of Social Services of plaintiff's application for general assistance benefits[1] on behalf of himself, his wife, and their three children. Plaintiff and his family, immigrants from Lebanon, are legal resident aliens who, at times pertinent to this appeal, had lived in the United States for less than three years.

The application was denied pursuant to a policy set forth in the DSS Assistance Payments Manual (APM),[2] Item 210, which in pertinent part provides:

> For the three years following an alien's date of entry into the United States (U.S.), the income and assets of the alien's sponsor must be considered in determining the ADC/GA [Aid to Families With Dependent Children[3]/General Assistance] eligibility of the alien:
>
> *  *  *
>
> The income and assets of the sponsor must be evaluated to determine if a portion of the income and assets are deemable, i.e., considered available without proof of actual contribution, to a sponsored alien(s) included in an ADC/GA group.
>
> The portion of the assets and income of the

---

[1] MCL 400.55 et seq.; MSA 16.455 et seq.

[2] Statutory criteria limiting eligibility for general assistance are set forth in MCL 400.55(a); MSA 16.455(a).

[3] Title IV(A) of the Social Security Act, 42 USC 601 et seq.

sponsor that are determined to be deemable to the alien are considered available to the sponsored alien even if the sponsor does not actually make a contribution or states he has given up sponsorship responsibilities.

A sponsor is defined in the APM, Item 210, as follows:

A sponsor is a person who signed an affidavit or other statement accepted by the Immigration and Naturalization Service (INS) as an agreement to support an alien as a condition of the alien's admission for permanent residence in the U.S.

Plaintiff and his family were sponsored as immigrants by Nassib Badawy, plaintiff's father-in-law, who executed an affidavit of support required by the Federal Immigration and Naturalization Service.[4]

After making inquiries, the DSS determined that the sponsor's monthly income exceeded standards which it has established, and that the excess should be "deemed" to be income available to the plaintiff. At the time of his application for assistance, plaintiff was unemployed, he had no income, and he and his family were receiving no support from their sponsor.

Following a hearing requested by the plaintiff, a

---

[4] See 8 USC 1183, which provides in part:

An alien excludable under paragraph (7) or (15) of section 1182(a) of this title may, if otherwise admissible, be admitted in the discretion of the Attorney General upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States, and to all States, territories, counties, towns, municipalities, and districts thereof holding the United States and all States, territories, counties, towns, municipalities, and districts thereof harmless against such alien becoming a public charge.

hearing referee found inter alia that denial of benefits by the DSS was proper, and that "the claimants were not denied public assistance [on the basis of] being resident aliens per se, but [on the basis of] 'excess income' of the sponsor's."

On appeal, the circuit court reversed, holding that the DSS policy violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as well as art 10, § 6 of the Michigan Constitution. The Court of Appeals affirmed on the Fourteenth Amendment ground, but did not address plaintiff's claimed violation of the Michigan Constitution. 150 Mich App 380; 388 NW2d 702 (1986). We granted leave to appeal.

II

"[E]ach aspect of the Fourteenth Amendment reflects an elementary limitation on state power." *Plyler v Doe,* 457 US 202, 213; 102 S Ct 2382; 72 L Ed 2d 786 (1982), reh den 458 US 1131 (1982). It provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Although the constitution "does not require things which are different in fact or opinion to be treated in law as though they were the same," *Tigner v Texas,* 310 US 141, 147; 60 S Ct 879; 84 L Ed 1124 (1940), the Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly circumstanced shall be treated alike." *F S Royster Guano Co v Virginia,* 253 US 412, 415; 40 S Ct 560; 64 L Ed 989 (1920). These propositions, though distinct, are compatible. However, the juxtaposition of equality under the Fourteenth Amendment with constitutional principles requires that a state-created classification minimally bear

some fair relationship to a legitimate public purpose. Certain classifications that impinge upon the exercise of a "fundamental right" or that disadvantage a "suspect class" are presumed to be invidious and thus are judged by a more demanding standard.

In the instant case, plaintiff maintains that the Department of Social Services policy under which excess income of an alien's sponsor is deemed to be income of the applicant establishes a presumptively invidious classification based on a "suspect class," alienage.

The constitutional status of resident aliens escapes simple characterization. Despite the status of aliens as "persons" within the meaning of the Fourteenth Amendment,[5] the United States Supreme Court has not set forth a single test for determining whether an alienage classification is violative of equal protection. The standard of review has varied depending upon the governmental interest at stake and the purpose served by such a classification. For instance, the states have been accorded considerable latitude in allocating political power, including the use of classifications to exclude noncitizens from holding governmental positions. The United States Supreme Court has utilized a traditional rational basis test when a state law primarily "serves a political function." *Cabell v Chavez-Salido,* 454 US 432, 439; 102 S Ct 735; 70 L Ed 2d 677 (1982). Where state law has been directed at *illegal* aliens, the Court has required the state to demonstrate that its classification furthers a substantial state goal. *Plyler v Doe, supra.* When examining federal, rather than state, laws involving classification based upon alienage or citizenship, the Court has used a less stringent standard, recognizing the broad power of Congress

[5] *Yick Wo v Hopkins,* 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886).

over immigration and naturalization and the important federal interest in foreign affairs and foreign relations. *Mathews v Diaz,* 426 US 67, 84-87; 96 S Ct 1883; 48 L Ed 2d 478 (1976); *De Canas v Bica,* 424 US 351, 358, n 6; 96 S Ct 933; 47 L Ed 2d 43 (1976).

On the other hand, when state or local laws "classify persons on the basis of United States citizenship for the purpose of distributing economic benefits, or limiting the opportunity to engage in private sector economic activity, the law will be subjected to strict judicial scrutiny." Nowak, Rotunda & Young, Constitutional Law (3d ed), p 631. In *Graham v Richardson,* 403 US 365, 372; 91 S Ct 1848; 29 L Ed 2d 534 (1971), the Supreme Court held that the Equal Protection Clause prevented a state from conditioning welfare benefits either upon the possession of citizenship or residence in the United States for a specified number of years. The Court explained:

> Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis. [Citations omitted.] This is so in "the area of economics and social welfare." *Dandridge v Williams,* 397 US 471, 485 [90 S Ct 1153; 25 L Ed 2d 491] (1970). But the Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a "discrete and insular" minority (see *United States v Carolene Products Co,* 304 US 144, 152-153, n 4 [58 S Ct 778; 82 L Ed 1234 (1938)]) for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi* [*v Fish & Game Comm*], 334 US [410,] 420 [68 S Ct 1138; 92 L Ed 1478 (1948)], that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within

narrow limits."[6] [*Graham, supra,* 403 US 371-372. See also *Cabell, supra,* p 438; *In re Griffiths,* 413 US 717; 93 S Ct 2851; 37 L Ed 2d 910 (1973).]

Subsequently, in *Nyquist v Mauclet,* 432 US 1, 8, n 9; 97 S Ct 2120; 53 L Ed 2d 63 (1977), the Court reaffirmed that "classifications based on alienage 'are inherently suspect and are therefore subject to strict scrutiny whether or not a fundamental right is impaired.' "[7]

In the case now before us, the DSS maintains that its policy does not establish a classification based on alienage, but rather one based on the availability of sponsor income as a factor in determining eligibility. The DSS points out, for example,

---

[6] In a concurring opinion in *Toll v Moreno,* 458 US 1, 20-21; 102 S Ct 2977; 73 L Ed 2d 563 (1982), Justice Blackmun explained the underlying basis for the designation of aliens as a "discrete and insular" minority:

By labeling aliens a " 'discrete and insular' minority," *Graham v Richardson,* 403 US 365, 372 (1971), the Court did something more than provide a historical description of their political standing. That label also reflected the Court's considered conclusion that for most legislative purposes there simply are no meaningful differences between resident aliens and citizens, see *Ambach v Norwick,* 441 US 68, 75 [99 S Ct 1589; 60 L Ed 2d 49] (1979), so that aliens and citizens are "persons similarly circumstanced" who must "be treated alike." *F S Royster Guano Co v Virginia,* 253 US 412, 415 (1920). At the same time, both common experience and the unhappy history reflected in our cases, see *Cabell v Chavez-Salido,* 454 US 432, 462-463 (1982) (dissenting opinion); *Ambach v Norwick,* 441 US at 82 (dissenting opinion), demonstrate that aliens often have been the victims of irrational discrimination.

In combination, these factors—disparate treatment accorded a class of "similarly circumstanced" persons who historically have been disabled by the prejudice of the majority—led the Court to conclude that alienage classifications "in themselves supply a reason to infer antipathy," *Personnel Administrator of Massachusetts v Feeney,* 442 US 256, 272 [99 S Ct 2282; 60 L Ed 2d 870] (1979), and therefore demand close judicial scrutiny.

---

[7] In *Nyquist,* the Court invalidated a state law which granted aid for higher education only to citizens and resident aliens who were or would be applying for citizenship.

that the excess income of a stepfather can be deemed available to a child who applies for similar benefits, even though the stepfather is not legally obligated to support the applicant. Similar policies require that excess income of a grandparent, aunt, uncle, cousin, niece, or nephew who lives in the same house will be deemed to be available to the applicant for purposes of determining eligibility. See MDSS Assistance Manual, Chapter 1, § 1.2. Moreover, the DSS notes that in *Schweiker v Gray Panthers,* 453 US 34; 101 S Ct 2633; 69 L Ed 2d 460 (1981), federal regulations permitting the "deeming" of the availability of income between spouses, even where a Medicaid applicant was institutionalized and no longer living with her spouse, were held to be valid. Thus, the DSS reasons that the alien sponsor policy is merely one of many department policies requiring applicants for general assistance to rely on available sources of support instead of welfare benefits.

We need only summarily note that none of the above policy examples utilize a criterion of citizenship or alienage. The mere existence of these other categories cannot justify the fact that the APM, Item 210 is applicable only to aliens.

Defendant further contends that since its policy "only applies to a narrowly defined group of aliens," i.e., those aliens with sponsor agreements, rather than all aliens, it is not unconstitutional.[8] However, the fact that all aliens are not affected by the DSS policy has no bearing on our equal protection analysis. See *Graham v Richardson, supra,* where the statute in question restricted

[8] There are a number of classifications of resident aliens which have no income imputed to them: aliens who applied for or received ADC/GA prior to February 1, 1982; refugees; aliens granted political asylum; Cuban/Haitian entrants; those in the country as conditional entrant refugees; dependent children of either the sponsor or sponsor's spouse; and children of illegal residents.

welfare benefits to those aliens who had met the durational residency requirement. In *Nyquist, supra,* p 9, the Court reiterated that

> [t]he important points are that [that statute] is directed at aliens and that only aliens are harmed by it. *The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class.* Cf. *Mathews v Lucas,* 427 US 495, 504-505, n 11 [96 S Ct 2755; 49 L Ed 2d 651] (1976); *Weber v Aetna Casualty & Surety Co,* 406 US 164, 169, 172 [92 S Ct 1400; 31 L Ed 2d 768] (1972). [Emphasis supplied.]

We find that the policy here, by its very terms, is "directed" at sponsored resident aliens. There is no dispute that only aliens are addressed by the policy, and that therefore only aliens can be harmed by it. We therefore agree with the Court of Appeals that the DSS policy forms a classification based on alienage.[9]

Consequently, we apply strict judicial scrutiny to determine whether the DSS policy set forth in the APM, Item 210, violates the equal protection provision of the Fourteenth Amendment. *Graham, supra,* 403 US 372. In undertaking this scrutiny,

> "[T]he governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made

---

[9] The following insight by Justice Frankfurter has relevance here:

[T]he great divide in the [equal protection] decisions lies in the difference between emphasizing the actualities or the abstractions of legislation.

. . . To recognize marked differences that exist in fact is living law; to disregard practical differences and concentrate on some abstract identities is lifeless logic. [*Morey v Doud,* 354 US 457, 472; 77 S Ct 1344; 1 L Ed 2d 1485 (1957) (dissent).]

whether the means adopted to achieve the goal are necessary and precisely drawn." [Citations omitted.] Alienage classifications by a State that do not withstand this stringent examination cannot stand. [*Nyquist, supra,* 432 US 7.]

The requisite state interest has otherwise been characterized as "overriding" or "compelling." *In re Griffiths, supra,* 413 US 722, n 9.

Defendant represents that the goal of the policy in question is based upon "the Legislative determination that it is not unreasonable to require assistance applicants to rely on such persons [sponsors] for support before limited public funds will be used, thus ensuring that public funds will be available to persons who do not have such sources of income to turn to." The DSS maintains that it is a legitimate state interest "to insure that limited public welfare funds are expended on behalf of those persons most in need."

We certainly concur that the conservation of scarce economic resources for persons most in need is, in and of itself, a laudatory goal. However, it is not sufficient reason to justify discrimination against a suspect class. The Court dealt with a similar argument in *Graham, supra,* 403 US 374-375, stating:

> [A] State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify Pennsylvania's making noncitizens ineligible for public assistance, and Arizona's restricting benefits to citizens and longtime resident aliens. First, the special public interest doctrine was heavily grounded on the notion that "[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship." *People v Crane,* 214 NY [154, 164; 108 NE 427 (1915)]. But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is character-

ized as a "right" or as a "privilege." [Citations omitted.] Second, as the Court recognized in *Shapiro* [v *Thompson*]: "[A] state has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. . . . The saving of welfare costs cannot justify an otherwise invidious classification." 394 US [618, 633; 89 S Ct 1322; 22 L Ed 2d 600 (1969)]. Since an alien as well as a citizen is a "person" for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in *Shapiro.*

The allocation of limited welfare benefits is "particularly inappropriate and unreasonable when the discriminated class consists of aliens." *Graham, supra,* 403 US 376. The *Graham* Court emphasized:

"Aliens like citizens pay taxes and may be called into the armed forces. Unlike the short-term residents in *Shapiro,* aliens may live within a state for many years, work in the state and contribute to the economic growth of the state." [See also *Nyquist, supra,* 432 US 12.]

The DSS advances a second argument in support of its claim that even if the APM, Item 210, is a classification based upon alienage, it is not an unconstitutional classification. The DSS maintains that the state's general assistance policy mirrors federal objectives and thus withstands strict scrutiny. Defendant points out that many of the general assistance financial eligibility requirements are identical to federal Aid to Families with Dependent Children eligibility requirements, including the requirement regarding the treatment of

income of a resident alien's sponsor. See 42 USC 615; 45 CFR 233.51-233.52. Defendant contends that the "deeming" requirements of the state program are consistent with the underlying objectives of the federal government's AFDC "deeming" policy —that aliens who are likely to become public charges should not be admitted to the United States. 8 USC 1182(a)(15).

We note that plaintiff has abandoned his AFDC claim.[10] Therefore, we are dealing solely with the state's ability to treat aliens differently. There is a significant distinction between the constitutional limits on state power and the constitutional grant of power to the federal government with respect to aliens.

In *De Canas v Bica, supra,* the Supreme Court recognized that the states do have some authority to act with respect to *illegal* aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal. See also *Plyler, supra,* 457 US 225. However, the states are on a short leash with regard to the control and categorization of legal aliens—the Supreme Court has long recognized the preëminent role of the federal government with respect to the regulation of resident aliens lawfully within the United States. As explained by the Court in *Toll v Moreno,* 458 US 1, 10-11; 102 S Ct 2977; 73 L Ed 2d 563 (1982):

> [O]ur cases have also been at pains to note the substantial limitations upon the authority of the States in making classifications based upon alienage. In *Takahashi v Fish & Game Comm'n, supra,* we considered a California statute that precluded aliens who were "ineligible for citizenship under federal law" from obtaining commercial fishing licenses, even though they "met all other state

[10] Nov. 13, 1984 circuit court hearing transcript, pp 2-3.

requirements" and were lawful inhabitants of the State. 334 US, at 414. In seeking to defend the statute, the State argued that it had "simply followed the Federal Government's lead" in classifying certain persons as "ineligible for citizenship." *Id.,* at 418. We rejected the argument, stressing the delicate nature of the federal-state relationship in regulating aliens:

"The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. *State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid." Id.,* at 419 (emphasis added) (citation and footnote omitted).

The decision in *Graham v Richardson, supra,* was a logical extension of the delineation of state and federal powers set forth in *Takahashi, supra.* The *Graham* Court noted that Congress has not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States. The Court perceived the states' alien residence requirements for welfare benefits as an encroachment upon the exclusive federal power to regulate entrance and abode. *Graham, supra,* 403 US 377-379.

The Court's subsequent decision in *Mathews v Diaz, supra,* does not bolster defendant's position. In *Mathews,* the Court held that Congress could condition an alien's eligibility for participation in a federal medical insurance program on continu-

ous residence in the United States for a five-year period. The Court did not subject the federal statute to strict scrutiny as it did the state statute in *Graham*. However, the Court found no inconsistency in its application of a less stringent standard of review, emphasizing that Congress, as an aspect of its broad power to control immigration, enjoys rights to distinguish among aliens that are not shared by the states:

> Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business. Furthermore, whereas the Constitution inhibits every State's power to restrict travel across its own borders, Congress is explicitly empowered to exercise that type of control over travel across the borders of the United States.
>     . . . [I]t is not "political hypocrisy" to recognize that the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization. [*Mathews v Diaz, supra,* 426 US 85-87. See also *Nyquist, supra,* 432 US 7, n 8.]

This distinction between the constitutional limits on state power and the plenary powers of the federal government in the field of immigration thus defeats defendant's attempted analogy in this instance. The state cannot constitutionally follow the federal government's lead in utilizing classifi-

cations based on alienage to dispense economic benefits.[11]

Finally, the DSS policy does not survive strict judicial scrutiny because it has not been shown that the "means adopted to achieve the goal are necessary and precisely drawn." *Nyquist, supra,* 432 US 7. The APM, Item 210 policy cannot withstand close scrutiny because of the way it affects resident aliens only and without any regard to their actual financial condition.

Defendant argues that its "classification is based directly on degree of need. A person with an alternate source of support is less needy than one without."[12] This viewpoint is simply not supported by the facts of this case. There is no dispute that the El Souri family receives no support in fact from their sponsor. The classification, by utilizing an irrebuttable presumption that sponsor income is available to an alien applicant, necessarily includes many resident aliens, such as the plaintiff here, whose sponsors have reneged on their agreements with the INS and who in fact receive no income from their sponsors.[13] The DSS' goal of

[11] The DSS' reliance on *Schweiker v Gray Panthers, supra,* is misplaced for a similar reason. *Schweiker* dealt with Congress' intent to have sponsor income "deemed" available to Medicaid applicants. Congressional intent in a federal program has no bearing on the regulation of Michigan's state-funded general assistance program.

[12] Defendant maintains that its regulation establishes a classification which takes into account reasonably available income of sponsors who are at least morally obligated to support general assistance applicants. The parties in this case have not questioned that there is a "moral" obligation for sponsors to support persons in this classification, rather than a legal obligation. See *State ex rel Attorney General v Binder,* 356 Mich 73; 96 NW2d 140 (1959); *California Dep't of Mental Hygiene v Renel,* 10 Misc 2d 402; 173 NYS2d 231 (1958).

See also *San Diego Co v Viloria,* 276 Cal App 2d 350; 80 Cal Rptr 869 (1969), for a discussion of why the "moral" obligation in the sponsor's affidavit of support is not generally considered to be a legally binding agreement.

[13] Plaintiff has not raised a due process argument per se in regard to the irrebuttable presumption created by the DSS. We therefore need

insuring the availability of public funds for persons without outside income is therefore not met by its own policy. The APM, Item 210 policy not only contradicts its stated purpose but does so in a discriminatory manner.

In *Plyler v Doe,* a Texas statute withholding funds from local school districts for education of children not legally admitted into the United States and authorizing districts to deny enrollment to such children was held to violate the Equal Protection Clause. In striking down the statute, the Court stated:

> "[V]isiting . . . condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the . . . child is an ineffectual—as well as unjust —way of deterring the parent." *Weber v Aetna Casualty & Surety Co,* 406 US 164, 175 [92 S Ct 1400; 31 L Ed 2d 768] (1972) (footnote omitted).
>
> Of course, undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful, action. But § 21.031 is directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control. It is thus difficult to conceive of a rational justification for penalizing these children for their presence within the United States. Yet that appears to be precisely the effect of § 21.031. [*Plyler, supra,* p 220.]

In the instant case, the El Souri family, lawfully

---

not address the question here. See, generally, *Lavine v Milne,* 424 US 577; 96 S Ct 1010; 47 L Ed 2d 249 (1976).

in the United States and undisputedly in need of public assistance, has been denied it. This dilemma has occurred because "deeming" is invoked by the policy whether or not the sponsor has an enforceable obligation to support the applicant and whether or not the applicant receives any income from the sponsor. The state's interest in preserving limited funds while assisting those truly in need might be better served if its "deeming" policy were more precisely drawn so as to include only income actually available to any general assistance applicant from another source, such as a sponsor or relative.[14]

We suggest that the stated goal of the DSS could be achieved through other constitutional means. However, in reviewing the constitutionality of a challenged classification, "it is not the function of a court 'to hypothesize independently on the desirability or feasibility of any possible alternative[s]' to the [policy] formulated by [the state]." *Lalli v Lalli,* 439 US 259, 274; 99 S Ct 518; 58 L Ed 2d 503 (1978) (quoting *Mathews v Lucas,* 427 US 495, 515; 96 S Ct 2755; 49 L Ed 2d 651 [1976]).

We conclude that the APM, Item 210 policy in question is a state-created classification based on alienage and is subject to strict judicial scrutiny. Pursuant to our analysis above, the DSS policy unconstitutionally discriminates against resident aliens. We therefore need not discuss plaintiff's claim that the DSS policy violates his rights under art 10, § 6 of the Michigan Constitution. Accord-

---

[14] Indeed, the DSS policy in question appears to violate one of defendant's own regulations, to wit:

   Only income and resources which are *available in fact* for current use are to be considered in determining the need of individuals for assistance and the amount of payments to or for them. [1979 AC, R 400.12(10). Emphasis added.]

ingly, we affirm the decision of the Court of Appeals.

RILEY, C.J., and LEVIN, BRICKLEY, CAVANAGH, BOYLE, and ARCHER, JJ., concurred with GRIFFIN, J.