ROSE v STOKELY

Docket No. 241029. Submitted May 28, 2003, at Lansing. Decided August
28, 2003, at 9:10 A.M.

The Calhoun County prosecutor brought a paternity action in the Cal-
houn Circuit Court, Family Division, on behalf of Billie M. Rose, an
unwed mother who was receiving public assistance and had the
expenses related to her child's birth paid by the Family Indepen-
dence Agency (FIA), against Robert J. Stokely, seeking, in part, an
order of filiation and an order requiring the defendant to repay the
FIA for all the plaintiff's confinement expenses related to the birth.
The court, James C. Kingsley, J., entered an order of filiation and
also ordered that the confinement expenses be apportioned
between the plaintiff mother and the defendant father, according to
their respective abilities to pay. Following an investigation by the
friend of the court, the court ordered the plaintiff to assume liabil-
ity for forty-one percent of the expenses and the defendant to
assume liability for fifty-nine percent of the confinement expenses.
The Court of Appeals denied the prosecutor's application for leave
to appeal in an order entered June 28, 2001 (Docket No. 234392).
The Supreme Court, in lieu of granting leave to appeal, remanded
the matter to the Court of Appeals for consideration as on leave
granted. 466 Mich 860 (2002). The Court of Appeals reversed the
order of the circuit court and remanded the matter to the circuit
court, finding that the relevant provisions of the Paternity Act allo-
cate all liability for the mother's confinement expenses to the
father and do not grant the court discretion to apportion the
expenses between the parents. The Court of Appeals noted that
were it not required by MCR 7.215(J)(2) to follow the holding in
*Thompson v Merritt*, 192 Mich App 412 (1991), which held that the
statute does not create a classification based on gender and does
not violate equal protection guarantees, the Court of Appeals
would hold that the statute does create a classification based on
gender and violates the defendant's equal protection rights. 253
Mich App 236 (2002). A special panel of the Court of Appeals was
thereafter convened to resolve the conflict between this matter and
*Thompson*. The Court of Appeals also vacated the portion of the
opinion addressed in section III of the opinion released on October
1, 2002. 253 Mich App 801 (2002).

In an opinion by WHITBECK, C.J., joined by NEFF and MARKEY, JJ., and a separate concurring opinion by WHITE, J., the Court of Appeals *held*:

The statutory classification is based on a real and immutable distinction between the mother and the father. The guarantee of equal protection does not require that things that are in fact different be treated as though they were the same. The immutable differences between men and women have allocated the physical burden of confinement and childbirth to the mother. In light of this reality, the Legislature does not violate the equal protection guarantee by allocating the financial burden of the mother's confinement expenses to the father.

Chief Judge WHITBECK, joined by Judges NEFF and MARKEY, noted in addition that, applying the heightened scrutiny level of review to the issue, ensuring the support and education of children born out of wedlock is an important governmental objective. Holding the father liable for the necessary confinement expenses of the mother of a child born out of wedlock is substantially related to that objective in that proper medical care during the confinement period is an essential form of support for the child. Making the father liable for the necessary confinement expenses assures that under all circumstances the child will receive this essential support. The relevant statutes provide a constitutionally permissible means to an important legislatively established end.

Reversed and remanded.

Judge GRIFFIN, joined by Judges METER and COOPER, dissenting, stated that the confinement cost allocation provisions constitute a sex-based classification that, under heightened scrutiny analysis, violates the equal protection guarantees of the state and federal constitutions. The interest of the child in obtaining necessary support is not substantially furthered by the arbitrary and inflexible rule of liability for confinement expenses based solely on a parent's sex. The arbitrary mandate based solely on a parent's sex is not substantially related to an important governmental objective. The order of the trial court should be affirmed.

CONSTITUTIONAL LAW — PARENT AND CHILD — EQUAL PROTECTION — CHILDREN BORN OUT OF WEDLOCK — CONFINEMENT EXPENSES OF MOTHER.

The provisions of the Paternity Act that allocate to the father of a child born out of wedlock all liability for the mother's confinement expenses does not violate the Equal Protection Clause of the state and federal constitutions (US Const, Am XIV; Const 1963, art 1, § 2; MCL 722.712[1], 722.717[2]).

*John Hallacy*, Prosecuting Attorney, and *Niels M. Magnusson III*, Assistant Prosecuting Attorney, for Billie M. Rose.

*Robison Law Office, P.C.* (by *Mark J. Robison* and *Charles A. Robison*), for Robert J. Stokely.

Amici Curiae:

*Karen S. Sendelbach, Judith Curtis, Kent Weichmann*, and *Charlotte Allen*, for the Family Law Section of the State Bar of Michigan.

*Stuart Law Offices* (by *Mark F. Stuart*) and *Scott Sussman* for the Center on Fathers, Families, and Public Policy.

Before: WHITBECK, C.J., and GRIFFIN, NEFF, WHITE, MARKEY, METER, and COOPER, JJ.

WHITBECK, C.J. This case involves an equal protection challenge, on gender-based grounds, to the constitutionality of certain provisions of the Paternity Act[1] that allocate the "confinement expenses" of a child born out of wedlock entirely to the father of that child. The circuit court did not directly address the constitutional challenge, relying primarily on the decision of this Court in *Thompson v Merritt.*[2] The prosecutor filed for leave to appeal, which this Court initially denied.[3] The prosecutor then sought leave to appeal to the Michigan Supreme Court, which, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted, stating:

---

[1] MCL 722.711 *et seq.*

[2] *Thompson v Merritt*, 192 Mich App 412; 481 NW2d 735 (1991).

[3] *Rose v Stokely*, unpublished order of the Court of Appeals, entered June 28, 2001 (Docket No. 234392) (*Stokely I*).

The Court of Appeals is directed to determine the proper level of scrutiny to be applied to plaintiff's [sic, defendant's] equal protection claim, and whether MCL 722.712(1) violates that standard. *Crego v Coleman*, 463 Mich 248 (2000); *Geduldig v Aiello*, 417 US 484 [94 S Ct 2485; 41 L Ed 2d 256] (1974).[4]

On remand, this Court stated that, but for *Thompson v Merritt*, it would find the challenged provisions to be unconstitutional.[5] This finding set in motion the conflict provisions of MCR 7.215(I)(2), now MCR 7.215(J)(2), and this conflict panel was convened by order of the Court. 253 Mich App 801 (2002). We reverse and remand.

## I. SUMMARY OF THE ISSUE

The *Stokely II* opinion concisely sets out the constitutional issue in this case: Do the Paternity Act's confinement expense allocation provisions constitute impermissible gender-based discrimination, in violation of the Equal Protection Clause of both the Michigan and the federal constitutions?[6]

## II. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE STATUTORY PROVISIONS

The challenged provisions of the Paternity Act are contained in subsection 2(1),[7] dealing with the liabili-

---

[4] *Rose v Stokely*, order of the Supreme Court, entered April 30, 2002 (Docket No. 119733).

[5] *Rose v Stokely*, 253 Mich App 236; 655 NW2d 770 (2002) (*Stokely II*).

[6] *Stokely II, supra* at 245.

[7] MCL 722.712(1).

ties of the parents of a child born out of wedlock,[8] and subsection 7(2),[9] dealing with orders of filiation.[10] Subsection 2(1) provides:

> The parents of a child born out of wedlock are liable for the necessary support and education of the child. They are also liable for the child's funeral expenses. *The father is liable to pay the expenses of the mother's confinement, and is also liable to pay expenses in connection with her pregnancy as the court in its discretion may deem proper.* The court shall admit in proceedings under this act a bill for funeral expenses, expenses of the mother's confinement, or expenses in connection with the mother's pregnancy, which bill constitutes prima facie evidence of the amount of those expenses, without third party foundation testimony.[11]

Subsection 7(2) provides, in pertinent part:

> An order of filiation entered under subsection (1) shall specify the sum to be paid weekly or otherwise, as pre-

---

[8] At the time of the enactment of the Paternity Act in 1956, the act defined a "child born out of wedlock" as "a child begotten and born to any woman who was unmarried from the conception to the date of birth of the child." See 1956 PA 205, subsection 1(a). Currently, the act defines a "child born out of wedlock" as "a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or a child that the court has determined to be a child born or conceived during a marriage but not the issue of that marriage." See MCL 722.711(a).

[9] MCL 722.717(2).

[10] At the time of the enactment of the Paternity Act in 1956, an "order of filiation" was used for "declaring paternity and for the support and education of the child" when there was a finding of the court or a verdict against the defendant, or if the defendant acknowledged paternity orally or in writing, or if the defendant was served a summons or warrant and a default was taken against him. See 1956 PA 205, § 7. Currently, an "order of filiation" is used for "declaring paternity and providing for the support of the child" when there is a finding of the court or the verdict determines the man is the father, or where the defendant acknowledges paternity either orally to the court or by a filing with the court of a written acknowledgment of paternity, or the defendant is served with summons and a default judgment is entered against him or her. See MCL 722.717(1).

[11] Emphasis supplied.

scribed in section 5 of the support and parenting time enforcement act, until the child reaches the age of 18. Subject to section 5b of the support and parenting time enforcement act, the court may also order support for a child after he or she reaches 18 years of age. *In addition to providing for the support of the child, the order shall also provide for the payment of the necessary expenses incurred by or for the mother in connection with her confinement, for the funeral expenses if the child has died, for the support of the child before the entry of the order of filiation, and for the expenses in connection with the pregnancy of the mother or of the proceedings as the court considers proper.*[12]

### B. THE CIRCUIT COURT PATERNITY ACTION

In this case, on June 12, 1996, plaintiff Billie Rose gave birth to a daughter who, under the provisions of the Paternity Act, was a "child born out of wedlock." According to the Calhoun County prosecutor, Rose received Medicaid and the state of Michigan, through the Michigan Family Independence Agency (FIA), paid the necessary birth expenses, in the total amount of $2,908.41. Accordingly, on May 4, 2000, the prosecutor filed a paternity complaint against defendant Robert Stokely, alleging that Rose received public assistance through the FIA, that the FIA had paid the expenses relating to the minor child's birth, that Stokely was not supporting the minor child, and that he was able-bodied and capable of providing support.

The circuit court entered an order of filiation and an order resolving child support and parenting time issues. However, when the prosecutor requested entry of an order requiring Stokely to repay the FIA

---

[12] Citations omitted; emphasis supplied.

for all of Rose's confinement expenses, Stokely
objected. He argued that the confinement expenses
should be apportioned between the mother and father
of a child born out of wedlock, according to each par-
ent's ability to pay because, if interpreted to impose
liability for confinement expenses on the father alone,
the Paternity Act would violate the Equal Protection
Clause of both the Michigan and the federal constitu-
tions. The prosecutor responded by arguing that the
Paternity Act imposed the sole liability for confine-
ment expenses on the father of a child born out of
wedlock and that this provision did not violate consti-
tutional protections.

In a written opinion dated November 30, 2000, the
circuit court noted that this Court had previously
decided in *Thompson v Merritt* that the statutory lan-
guage allows for the apportionment of confinement
costs. The circuit court opined that this interpretation
was not only proper, it was also necessary to main-
tain the constitutionality of the statute:

> An interpretation that the father must always be required
> to pay all of the costs of confinement in an Order of Filia-
> tion would constitute a gender-based classification. A gen-
> der-based classification is subject to so-called "intermediate
> scrutiny": to survive an equal protection challenge, the clas-
> sification must serve an important governmental objective
> and must be substantially related to achievement of that
> objective. *In the Matter of RFF, Minor. LAF, Appellant, v
> BJF, Appellee*, 242 Mich App 188, 209-210; 617 NW2d 745
> (2000), *Lehr v Robertson*, 463 US 266; 103 S. Ct. 2985 [77 L
> Ed 2d 614 (1983)]. "Gender-based classifications will be
> upheld when men and women are not similarly situated in
> the area covered by the legislation in question and the stat-
> utory classification is realistically based upon differences in
> their situations." *Parham v Hughes*, 441 U.S. 347, 354, 99 S.
> Ct. 1741, 60 L. Ed. 2d 269 (1979), cited in *RFF, supra*.

While it is true that unwed mothers and fathers are not always similarly situated with respect to their abilities to pay expenses associated with the birth of their children, that society has [and perhaps still does] imposed some measure of discrimination based on gender which has separated men from women with respect to their ability to pay expenses associated with children, there is simply no basis upon which to find that, as a rigid rule, differences in their situations are always based on their gender and are always such that the mother has no ability to pay any of the costs of her confinement and that the father should pay 100% of those costs in every case in which an Order of Filiation is entered.

Indeed, such a conclusion is contrary to the language of the rest of the statutes in question. MCL 722.712 opens with the proposition that both parents are liable for the support and education of their children, and for the childrens' [sic] funeral expenses. And in the last portion of the pertinent statutes, the Legislature clearly recognized the discretion of the court to apportion costs of pregnancy between the mother and father. It is not conceivable, given this recognition, that the Legislature would have intended to impose a rigid requirement that, without exception, the father would always and in all circumstances bear the full weight of the entire confinement expense.

The circuit court therefore ordered that Rose's confinement expenses be apportioned between her and Stokely, according to their respective abilities to pay. After an investigation, the friend of the court recommended that Rose assume forty-one percent and that Stokely assume fifty-nine percent of the liability for the confinement expenses. This allocation was based on a determination of each party's income and an application of the Michigan Child Support Formula Manual. The circuit court's order subsequently adopted that recommendation.

### C. *STOKELY II*

#### 1. SECTION II

After the Supreme Court remand, this Court considered two aspects of the circuit court's decision.[13] In section II of its opinion, the *Stokely II* panel concluded that §§ 2 and 7 of the Paternity Act did not grant a circuit court the discretion to apportion the confinement expenses of a mother of a child born out of wedlock between the mother and the father of that child.[14] The *Stokely II* panel noted that the circuit court had concluded that the phrase "as the court in its discretion may deem proper" in subsection 2(1) applied to the phrase the "expenses in connection with her pregnancy" and to the phrase "the expenses of the mother's confinement." With regard to subsection 7(2), the *Stokely II* panel similarly noted that the circuit court had concluded that the phrase "as the court considers proper" applied to the phrase "the expenses in connection with the pregnancy of the mother" and to the phrase "the necessary expenses incurred by or for the mother in connection with her confinement."[15] The *Stokely II* panel concluded that the statutory language regarding the circuit court's discretion relates to *only* those expenses incurred in connection with the mother's pregnancy, not to the expenses of the mother's confinement.[16]

---

[13] *Stokely II, supra.*

[14] *Id.* at 240.

[15] *Id.* at 241.

[16] *Id.* at 242-243. In a footnote, the *Stokely II* panel, *id.* at 242 n 8, read subsections 2(1) and 7(2) of the Paternity Act in pari materia to mean that the father is liable only for those confinement expenses that were necessarily incurred. In a separate footnote, the *Stokely II* panel noted that OAG, 1957-1958, No. 3030, p 200 (July 19, 1958), concluded that the Pater-

The *Stokely II* panel also concluded that the circuit court misinterpreted this Court's decision in *Thompson, supra,*[17] stating:

> The *Thompson* Court's reference to apportioning the financial burdens of parenthood does not support a conclusion that a circuit court possesses discretion to apportion confinement expenses between the mother and the father of a child born out of wedlock.[18]

### 2. SECTION III

In section III of its opinion, the *Stokely II* panel dealt with the issue whether the Paternity Act's confinement expense allocation provision constitutes impermissible gender-based discrimination, in violation of the Equal Protection Clause of both the Michigan and the federal constitutions. The *Stokely II* panel, citing *Crego v Coleman*[19] which in turn cites *Clark v Jeter,*[20] noted that an intermediate level of review, referred to as "heightened scrutiny," applies where the law results in classifications based on factors such as illegitimacy and gender.[21] The *Stokely II* panel stated that, were it not compelled by MCR 7.215(I), now MCR 7.215(J), to follow the rule of law established in *Thompson, supra,* it would hold that

---

nity Act requires the father of a child born out of wedlock to pay all necessary confinement expenses, rather than only a portion of those expenses. *Stokely II, supra* at 243 n 9.

[17] *Id.* at 243.

[18] *Id.* at 245. In a footnote, the *Stokely II* panel noted that the portion of *Thompson* discussing the Paternity Act's confinement expense allocation provision is obiter dictum. *Id.* at 245 n 10.

[19] *Crego v Coleman,* 463 Mich 248, 260; 615 NW2d 218 (2000).

[20] *Clark v Jeter,* 486 US 456, 461; 108 S Ct 1910; 100 L Ed 2d 465 (1988).

[21] *Stokely II, supra* at 246-247.

the statutory language does create a classification based on gender.[22]

The *Stokely II* panel then turned to the prosecutor's argument that the Paternity Act's confinement cost allocation provision is substantially related to the achievement of an important governmental objective. Specifically, the prosecutor had contended that unwed mothers might forgo needed medical care unless they were assured that they are not responsible for the expenses of such care. Relying on *Orr v Orr*, 440 US 268; 99 S Ct 1102; 59 L Ed 2d 306 (1979), the *Stokely II* panel concluded that, because individualized hearings could determine which unwed mothers are in need of financial assistance from the child's father the statutory purpose advanced by the prosecutor could be effectuated without placing the burden of confinement costs solely on fathers.[23]

The *Stokely II* panel also examined the common-law "necessaries" doctrine that required a husband to pay for his wife's necessary medical services, noted that the Michigan Supreme Court had abrogated the common-law necessaries doctrine in *North Ottawa Community Hosp v Kieft*,[24] and concluded that "the abrogation of the common-law necessaries doctrine removed any legitimate basis for the Paternity Act's allocation of confinement costs on the basis of gender."[25]

Finally, the *Stokely II* panel addressed the prosecutor's argument that, because the FIA pays the con-

---

[22] *Id.* at 247.

[23] *Id.* at 251.

[24] *North Ottawa Community Hosp v Kieft*, 457 Mich 394; 578 NW2d 267 (1998).

[25] *Stokely II, supra* at 252.

finement expenses of unwed mothers who receive state Medicaid benefits, the Legislature intended to permit recoupment of those expenses from the children's fathers. The *Stokely II* panel rejected this argument on two grounds[26] and ended section III of its opinion by stating:

> We would conclude that the Paternity Act's confinement cost allocation provision constitutes a gender-based classification that violates the Equal Protection Clauses of the Michigan and federal constitutions. However, we are constrained to follow *Thompson, supra* at 425, and hold that the statutory provision does not violate equal protection guarantees.[27]

### D. MCR 7.215(J)

Under MCR 7.215(J)(2), when a panel of this Court follows a prior published decision only because it must do so under MCR 7.215(J)(1), which gives precedential effect to opinions of the Court published on or after November 1, 1990, that panel must articulate in the text of its opinion that it is doing so, cite the rule, and explain its disagreement with the prior decision. Section III of the opinion in *Stokely II* met this requirement. After polling the judges of this Court, the majority of whom voted that the question was outcome determinative and that it warranted convening a special conflict panel, this Court ordered that a special conflict panel be convened, vacated the por-

---

[26] *Id.* at 253-254. In a footnote, the *Stokely II* panel noted the prosecutor's statement in his appellate brief that the grantee of public assistance does not have to repay government benefits absent misconduct. *Id.* at 253 n 19.

[27] *Id.* at 254.

tion of the *Stokely II* opinion concerning the conflict addressed in section III of the *Stokely II* opinion, and allowed the parties to submit supplemental briefs.[28]

### III. THE PROCESS OF CONSTITUTIONAL REVIEW

#### A. STANDARD OF REVIEW

The constitutionality of a statute is a question of law that this Court reviews de novo.[29]

#### B. APPLICABILITY OF THE EQUAL PROTECTION GUARANTEES AT THE THRESHOLD

The equal protection clauses of the Michigan and the federal constitutions require that no person be denied the equal protection of the law.[30] The Michigan Supreme Court has found Michigan's equal protection provision coextensive with the Equal Protection Clause of the federal constitution.[31] This constitutional guarantee requires that persons similarly situ-

---

[28] 253 Mich App 801 (2002). A subsequent order invited amici curiae briefs from the Family Law Section of the State Bar of Michigan and other interested parties. *Rose v Stokely*, unpublished order of the Court of Appeals, entered February 19, 2003 (Docket No. 241029). The Family Law Section and the Center on Fathers, Families, and Public Policy filed amicus curiae briefs. This Court very much appreciates the time and effort invested in these briefs, as well as in the supplemental briefs of the parties, and wishes to express its thanks to all those who participated in the filing of briefs and oral argument.

[29] *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457, 461; 639 NW2d 332 (2001). See also *McDougall v Scans*, 461 Mich 15, 24; 597 NW2d 148 (1999) (court's ruling whether a statute violates equal protection guarantees is a question of law).

[30] See Const 1963, art 1, § 2; US Const, Am XIV. See also *Frame v Knells*, 452 Mich 171, 183; 550 NW2d 739 (1996); *Spade v Pauley*, 149 Mich App 196, 203; 385 NW2d 746 (1986).

[31] *Crego, supra* at 258, citing *Frame, supra* at 183, and *Doe v Dep't of Social Services*, 439 Mich 650, 670-671; 487 NW2d 166 (1992).

ated be treated alike.[32] Stated negatively, the essence of the equal protection clauses is that the government not treat persons differently on account of characteristics that do not justify such disparate treatment.[33]

Nevertheless, the guarantee of equal protection under the law does not require things that are different in fact or opinion to be treated as though they were the same.[34] The courts have not applied the requirement of equal protection as mandating "absolute equality."[35] Similarly, it is well established that the equal protection guarantee is not a source of substantive rights or liberties; rather, it is a measure of our constitutions' tolerance of government classification schemes.[36] As the Michigan Supreme Court has said:

> Conversely, the Equal Protection Clauses do not prohibit disparate treatment with respect to individuals on account of other, presumably more genuinely differentiating, characteristics. *Puget Sound Power & Light Co v City of Seattle,* 291 US 619; 54 S Ct 542; 78 L Ed 1025 (1934). Moreover, even where the Equal Protection Clauses are implicated, they do not go so far as to prohibit the state from distinguishing between persons, but merely require that "the distinctions that are made not be arbitrary or invidious." *Avery*

---

[32] *F S Royster Guano Co v Virginia,* 253 US 412, 415; 40 S Ct 560; 64 L Ed 989 (1920); *El Sour v Dep't of Social Services,* 429 Mich 203, 207; 414 NW2d 679 (1987).

[33] *Crego, supra* at 258, citing *Miller v Johnson,* 515 US 900, 919; 115 S Ct 2475; 132 L Ed 2d 762 (1995), and *El Sour, supra* at 207.

[34] *Jefferson v Hackney,* 406 US 535, 549; 92 S Ct 1724; 32 L Ed 2d 285 (1972); *Reed v Reed,* 404 US 71, 75; 92 S Ct 251; 30 L Ed 2d 225 (1971); *Tiger v Texas,* 310 US 141, 147; 60 S Ct 879; 84 L Ed 1124 (1940).

[35] *Doe, supra* at 661, citing *San Antonio Independent School Dist v Rodriguez,* 411 US 1, 24; 93 S Ct 1278; 36 L Ed 2d 16 (1973).

[36] *Id.,* citing *San Antonio Independent School Dist, supra* at 58 [sic, p 59] (Stewart, J., concurring).

*v Midland Co, Texas,* 390 US 474, 484; 88 S Ct 1114; 20 L Ed
2d 45 (1968).[37]

At the threshold, the question is whether the provi-
sions of the Paternity Act that allocate all the neces-
sary confinement expenses of the mother of a child
born out of wedlock to the father of that child require
an application of the equal protection guarantees of
the Michigan and the federal constitutions. This is a
difficult question. Clearly, the mother and the father
of a child born out of wedlock are not similarly situ-
ated in a purely physical sense. In the context of
pregnancy, the father's physical role is limited to the
conception of the child. He has no physical role, after
conception, in carrying the child to term or in the
delivery of the child. The mother is *the* only neces-
sary actor at all stages of the process, from concep-
tion through pregnancy and delivery, including all the
physical and medical implications of each stage.
Moreover, the mother is usually the child's primary
caregiver during the infant's first weeks of life. These
are genuinely differentiating characteristics. Arguably,
then, the challenged provisions of the Paternity Act
are in direct response to the immutable difference
between men and women: the biological ability to
bear children.[38]

There are, however, factors that favor the opposite
conclusion. First, as the *Stokely II* opinion noted, sub-
section 2(1) of the Paternity Act clearly provides that
the father of a child born out of wedlock is liable for
the mother's confinement expenses; the statute does

---

[37] *Crego, supra* at 258-259.

[38] See *Crego, supra* at 273, citing *Geduldig, supra* at 496 n 20, and *Ros-
ter v Goldberg,* 453 US 57; 101 S Ct 2646; 69 L Ed 2d 478 (1981).

not make the mother and the father jointly liable for these expenses and does not grant a circuit court discretion to allocate these expenses on the basis of the parties' respective ability to pay. Thus, Stokely bears a burden he would not bear were he female.[39] Secondly, and more practically, the Supreme Court's remand order requires this Court to determine the proper "level of scrutiny" applicable to the equal protection claim, thereby perhaps implicitly assuming that subsection 2(1) of the Paternity Act contains a gender-based differentiation. Finally, the prosecutor conceded before the circuit court, conceded before the *Stokely II* panel,[40] and argued in the alternative before this panel that if the statute is a gender-based classification, it forwards a compelling governmental interest.[41]

Fortunately, it is not necessary to decide this issue at the threshold. As the Michigan Supreme Court has pointed out, implicit within the very existence of an "intermediate" or "heightened scrutiny" level of review—that is, a standard of review more respectful of legislative distinctions than that which is applied to the most highly suspect categories of race, nationality, and ethnicity—is an acknowledgment that "there are some immutable distinctions between various classes of persons, and that it is sometimes within the Legislature's prerogative to address those distinctions, even where the result is dissimilarity of treatment."[42]

---

[39] *Stokely II*, *supra* at 248, citing *Orr*, *supra* at 278-279.

[40] *Stokely II*, *supra* at 248, n 13.

[41] We do note, however, that here the prosecutor, in his supplemental brief to this Court, did advance the proposition that the Paternity Act "while acknowledging the unique circumstances of parties in a pregnancy and delivery situation, does not create a gender-based classification . . . ."

[42] *Crego*, *supra* at 272-273.

Therefore, the issue whether the challenged provisions of the Paternity Act contain a gender-based differentiation will be considered again, hereinafter, in the context of applying the appropriate level of review.

### C. THE LEVELS OF REVIEW

#### 1. THE EQUAL PROTECTION SPECTRUM: STRICT SCRUTINY REVIEW, RATIONAL BASIS REVIEW, AND HEIGHTENED SCRUTINY REVIEW

As the Michigan Supreme Court has said:

> When a party raises a viable equal protection challenge, the court is required to apply one of three traditional levels of review, depending on the nature of the alleged classification. The highest level of review, or "strict scrutiny," is invoked where the law results in classifications based on "suspect" factors such as race, national origin, or ethnicity, none of which are implicated in this case. *Plyler v Doe*, 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982). Absent the implication of these highly suspect categories, an equal protection challenge requires either rational-basis review or an intermediate, "heightened scrutiny" review.[43]

#### 2. STRICT SCRUTINY REVIEW

Strict scrutiny review stands at one end of the equal protection spectrum. When state legislation creates a classification scheme that is based on suspect

---

[43] *Id.* at 259. See also *Harvey v Michigan*, 469 Mich 1, 6-7; 664 NW2d 767 (2003).

factors, such as race,[44] national origin,[45] ethnicity, or alienage,[46] or that affects a fundamental interest,[47] courts apply strict scrutiny review.[48] When courts review statutes under this strict standard, they uphold the statutes only "if the state demonstrates that its classification scheme has been precisely tailored to serve a compelling governmental interest."[49] Rarely have courts sustained legislation under this standard of review.[50]

### 3. RATIONAL BASIS REVIEW

Rational basis review represents the other end of the equal protection spectrum. As the Michigan Supreme Court has stated:

> Under rational-basis review, courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose. *Dandridge v Williams*, 397 US 471, 485; 90 S Ct 1153; 25 L Ed 2d 491 (1970). To prevail under this highly deferential standard of review, a challenger must show that the legislation is "arbitrary and

---

[44] See *American States Ins Co v Dep't of Treasury*, 220 Mich App 586, 592-594; 560 NW2d 644 (1996). See also *Yuck Woo v Hopkins*, 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886); *Strider v West Virginia*, 100 US 303; 25 L Ed 664 (1879); Bickel, *The original understanding and the segregation decision*, 69 Hard L R 1 (1955).

[45] See *Yuma v California*, 332 US 633; 68 S Ct 269; 92 L Ed 249 (1948); *American States Ins Co, supra* at 592-594.

[46] See *SyQuest v Amulet*, 432 US 1, 8 n 9; 97 S Ct 2120; 53 L Ed 2d 63 (1977); *El Sour, supra; Chan v City of Troy*, 220 Mich App 376; 559 NW2d 374 (1996).

[47] See *Harper v Virginia Bd of Elections*, 383 US 663, 672; 86 S Ct 1079; 16 L Ed 2d 169 (1966); *Neal v Oakwood Hosp Corp*, 226 Mich App 701, 717-718; 575 NW2d 68 (1997).

[48] *People v Pitts*, 222 Mich App 260, 273; 564 NW2d 93 (1997).

[49] *Doe, supra* at 662, citing *Plyler, supra* at 216-217.

[50] *Manistee Bank & Trust Co v McGowan*, 394 Mich 655, 668; 232 NW2d 636 (1975), rev'd in part on other grounds in *Harvey, supra* at 9-14.

wholly unrelated in a rational way to the objective of the statute." *Smith v Employment Security Comm*, 410 Mich 231, 271; 301 NW2d 285 (1981). A classification reviewed on this basis passes constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable. *Shavers v Attorney General*, 402 Mich 554, 613-614; 267 NW2d 72 (1978). Rational-basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with "mathematical nicety," or even whether it results in some inequity when put into practice. *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 542; 273 NW2d 829 (1979). Rather, the statute is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption. *Shavers, supra.*[51]

Indeed, "[f]ew statutes have been found so wanting in 'rationality' as to fail to satisfy the 'essentially arbitrary' test."[52] Presumably, this is so because the rational basis test reflects the judiciary's awareness that " 'it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.' "[53]

### 4. HEIGHTENED SCRUTINY REVIEW

Heightened scrutiny review falls in the middle of the equal protection spectrum. As the Michigan Supreme Court has stated:

The standard recognizes that, while there may be certain immutable distinctions, for example, between men and women or between legitimate and illegitimate children, that justify differing legislative treatments under some circum-

---

[51] *Crego, supra* at 259-260, and *Harvey, supra* at 7-8.

[52] *Manistee Bank, supra* at 668.

[53] *American States Ins Co, supra* at 597, quoting *Gone v Abrams*, 793 F2d 74, 77 (CA 2, 1986).

stances, the Legislature's authority to invoke those distinctions should not be viewed as an "impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez v Perez*, 409 US 535, 538; 93 St Ct 872; 35 L Ed 2d 56 (1973) . . . . However, where a challenged statute is substantially related to an important state interest, the statute should be upheld.[54]

Gender-based classification schemes are subject to heightened scrutiny review. In *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation*,[55] the Michigan Supreme Court stated:

Historically, equal protection analysis began at the bottom tier, employing a "minimum rationality" or "rational basis" test in which a classification was required to be "reasonable in light of its purpose . . . ." *McLaughlin v Florida*, 379 US 184, 191; 85 S Ct 283; 13 L Ed 2d 222 (1964). Although the rational basis test was applied to early gender discrimination cases, see *Goesaert v Cleary*, 335 US 464; 69 S Ct 198; 93 L Ed 163 (1948), *such cases are now analyzed using the "heightened scrutiny" of middle tier, or intermediate level, review.*[56]

Thus, with the caveat that implicit within the heightened scrutiny test is the acknowledgment that it is sometimes within the Legislature's prerogative to address distinctions between various classes of persons—including men and women—even where the result is dissimilarity of treatment,[57] the *Stokely II*

---

[54] *Crego, supra* at 260-261, and *Harvey, supra* at 8-9.

[55] *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173; 387 NW2d 821 (1986).

[56] *Id.* at 190-191 (emphasis supplied). See also *Craig v Boren*, 429 US 190, 197; 97 S Ct 451; 50 L Ed 2d 397 (1976) (the fact that the classification expressly discriminates against men rather than women does not protect it from scrutiny).

[57] *Crego, supra* at 272-273.

panel's selection of heightened scrutiny as the appropriate test stands on solid precedent.

Under heightened scrutiny review there are two determinations that must be made. The first determination is whether the classification serves an *important* governmental interest. The second determination is whether the classification is *substantially* related to the achievement of the important governmental objective.[58] It is the judiciary's task to make each of these determinations.[59]

---

[58] *Waterford Twp, supra* at 191. See also *Neal v Dep't of Corrections (On Rehearing)*, 232 Mich App 730, 741; 592 NW2d 370 (1998). See further *Califano v Webster*, 430 US 313, 316-317; 97 S Ct 1192; 51 L Ed 2d 360 (1977).

[59] But see the acerbic dissent of Justice Rehnquist in *Trimble v Gordon*, 430 US 762, 777; 97 S Ct 1459; 52 L Ed 2d 31 (1977), in which he questioned the entire concept of taking equal protection analysis beyond a rational basis test in cases other than those involving race or national origin:

The Fourteenth Amendment's prohibition against "any State . . . deny[ing] to any person . . . the equal protection of the laws" is undoubtedly one of the majestic generalities of the Constitution. If, during the period of more than a century since its adoption, this Court had developed a consistent body of doctrine which could reasonably be said to expound the intent of those who drafted and adopted that Clause of the Amendment, there would be no cause for judicial complaint, however unwise or incapable of effective administration one might find those intentions. If, on the other hand, recognizing that those who drafted and adopted this language had rather imprecise notions about what it meant, the Court had evolved a body of doctrine which both was consistent and served some arguably useful purpose, there would likewise be little cause for great dissatisfaction with the existing state of the law.

Unfortunately, more than a century of decisions under this Clause of the Fourteenth Amendment have produced neither of these results. They have instead produced a syndrome wherein this Court seems to regard the Equal Protection Clause as a cat-o'-nine-tails to be kept in the judicial closet as a threat to legislatures which may, in the view of the judiciary, get out of hand and pass "arbitrary," "illogical," or "unreasonable" laws. Except in the area of the law in which the Framers obviously meant it to apply—classifications based on race or on national origin, the first cousin of race—the Court's decisions can fairly be described as an endless

### D. JUDICIAL DEFERENCE[60]

The scope of our judicial responsibility is, however, not unlimited. Granted, there is almost universal agreement that the power of the Legislature is also not without limits and "that those limits may not be mistaken, or forgotten, the Constitution is written."[61] Thus, as the Michigan Supreme Court has stated, "that those limits not be exceeded, the courts are entrusted with the responsibility to review and the power to nullify legislative acts which are repugnant to the constitution."[62]

Nevertheless, courts must use this authority sparingly. "[U]nder established rules of statutory construction, statutes are presumed constitutional, and courts have a duty to construe a statute as constitutional unless unconstitutionality is clearly apparent."[63] The Michigan Supreme Court stated in *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor,* "When compelled to make a constitutional pronouncement, the court must do so with great circumspection and trepidation, with language carefully tailored to be no broader than that demanded by the particular facts of the case rendering such a pronouncement necessary."[64] Further:

---

tinkering with legislative judgments, a series of conclusions unsupported by any central guiding principle.

[60] See, generally, *Crego v Coleman,* 232 Mich App 284, 315-318; 591 NW2d 277 (1998) (Whitbeck, J., dissenting).

[61] *Marbury v Madison,* 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803).

[62] *Manistee Bank, supra* at 666.

[63] *Mahaffey v Attorney General,* 222 Mich App 325, 344; 564 NW2d 104 (1997).

[64] *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor,* 455 Mich 557, 568; 566 NW2d 208 (1997), citing *United States v Raines,* 362 US 17, 21; 80 S Ct 519; 4 L Ed 2d 524 (1960).

> The court will not go out of its way to test the operation of a law under every conceivable set of circumstances. The court can only determine the validity of an act in the light of the facts before it. Constitutional questions are not to be dealt with in the abstract.[65]

Indeed, the party challenging the facial constitutionality of an act " 'must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . .' "[66] Here, neither Stokely nor the trial court specified whether the constitutional challenge to subsections 2(1) and 7(2) of the Paternity Act is a facial challenge or an "as applied" challenge. Because Stokely's challenge to the constitutionality of subsections 2(1) and 7(2) of the Paternity Act is directed to the words of these provisions themselves and because these provisions do not implicate constitutionally protected *conduct*, it is at least reasonably clear that what is involved here is a facial challenge.

Thus, we must presume subsections 2(1) and 7(2) of the Paternity Act to be constitutional unless their unconstitutionality is clearly apparent. Further, in ruling on this constitutional challenge, we must carefully tailor our language to the particular facts of this case.

---

[65] *General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940).

[66] *Council of Orgs, supra* at 568, quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). See also *Straus v Governor*, 459 Mich 526, 543; 592 NW2d 53 (1999), quoting *Salerno*. Note that facial challenges are also permitted in certain other contexts. If the law reaches a substantial amount of constitutionally protected conduct—free speech or free association are examples—it may be subject to a facial challenge. See *Kolender v Lawson*, 461 US 352, 358 n 8; 103 S Ct 1855; 75 L Ed 2d 903 (1983).

It is not our proper function to test the operation of
subsections 2(1) and 7(2) by contriving a conceivable
set of circumstances, nor are we to address the con-
stitutional question in the abstract. Rather, it is suffi-
cient that we recognize the fact that subsections 2(1)
and 7(2) might operate unconstitutionally under some
conceivable set of circumstances.

### IV. APPLYING HEIGHTENED SCRUTINY REVIEW[67]

#### A. DETERMINING THE IMPORTANT GOVERNMENTAL INTEREST

As noted above, the first step in an equal protection
analysis under heightened scrutiny review is to iden-

---

[67] In its cogent amicus curiae brief, the Family Law Section of the State
Bar of Michigan puts forth two arguments. The Family Law Section first
argues that subsection 2(1) of the Paternity Act is constitutionally valid
under the equal protection clauses of the Michigan and the federal consti-
tutions. Secondly, however, the Family Law Section argues that the alloca-
tion to the father of all the confinement expenses of the mother, without
any opportunity for a hearing on that issue, violates the Due Process
Clause of the federal constitution. While we find the second argument
interesting, the due process issue is simply not before us. Stokely did not
make a due process argument at the circuit court level. The application
for leave to appeal to this Court and the Supreme Court's remand to con-
sider the equal protection claim make no mention of a due process issue,
nor did the opinion of the *Stokely II* panel. We conclude that the issue has
not been preserved and we decline to consider it. See, for example,
*Butcher v Dep't of Treasury*, 425 Mich 262, 276; 389 NW2d 412 (1986).

We also note that section II of the *Stokely II* opinion dealt with the ques-
tion whether subsections 2(1) and 7(2) of the Paternity Act gave the cir-
cuit court the discretion to allocate confinement expenses between the
mother and the father of a child born out of wedlock. The *Stokely II* panel
concluded that neither the statutory language nor this Court's decision in
*Thompson* permits a court to enter an order apportioning confinement
expenses between the mother, here Rose, and the father, here Stokely.
Our order convening a special conflict panel vacated the portion of the
opinion concerning the conflict addressed in section III of the *Stokely II*
opinion, and that section only. Accordingly, the issue addressed in section
II of the *Stokely II* opinion is not before this Court. We consider it the law
of the case that neither the statutory language nor this Court's decision in
*Thompson* permits a court to enter an order apportioning confinement

tify the important governmental interest involved.[68]
The overall governmental interest at stake here is
inherent in the first words of the title of the Paternity
Act: "AN ACT to confer upon circuit courts jurisdiction
over proceedings *to compel and provide support of
children born out of wedlock . . . .*"[69] As the Michigan
Supreme Court has ruled, "[t]he underlying purpose
of the Paternity Act is to ensure that minor children
born outside a marriage are provided with support
and education."[70] In support of this conclusion, the
Court cited *Whybra v Gustafson*.[71] In that case, the
Court construed various provisions of the Paternity
Act, including the counterpart section to the current
subsection 7(2), and stated that "[p]atently, these pro-
visions seek to express society's concern with the
support and education of the 'child born out of wed-
lock.' "[72] Rather clearly, the Legislature addressed this
concern when it enacted the comprehensive provi-
sions of the Paternity Act and, equally clearly, the
confinement expenses language of subsections 2(1)
and 7(2) is part of that comprehensive legislative
scheme. Thus, the conclusion is inescapable that sub-
sections 2(1) and 7(2) relate to an important govern-
mental objective. Moreover, in light of the sobering
statistics relating to the increased health risks that
are specific to the babies of unmarried mothers, the
general governmental interest in providing support

---

expenses between the mother and the father of a child born out of wed-
lock. See *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612
NW2d 120 (2000).

[68] *Waterford Twp, supra* at 191.

[69] 1956 PA 205 (emphasis supplied).

[70] *Crego, supra* at 269.

[71] *Whybra v Gustafson*, 365 Mich 396, 400; 112 NW2d 503 (1961).

[72] *Id.*

for these at-risk babies is particularly important at the time of birth. A study by the Centers for Disease Control and Prevention covering births to unmarried mothers in the United States from 1980 to 1992 reported the following increased health risks:

> Unmarried mothers tend to have poorer birth outcomes than married mothers because they are disproportionately young, poorly educated, and are likely to be poor. . . .
>
> . . . Babies born to unmarried mothers of all ages are at greater risk than babies born to married mothers because of higher levels of inadequate prenatal care, higher maternal smoking rates, and higher levels of insufficient maternal weight gain. Furthermore, the risk of dying in infancy is greater among nonmarital births, particularly in the post-neonatal period. . . .
>
> \*          \*          \*
>
> . . . Unmarried mothers were much less likely than married mothers to receive adequate [prenatal] care . . . .
>
> Smoking during pregnancy has repeatedly been shown to be linked with an elevated risk of a low-birthrate outcome . . . .
>
> There is a substantial gap in smoking rates between married and unmarried mothers . . . Overall, 26 percent of unmarried mothers smoked during pregnancy in 1992 compared with 13 percent of married mothers. . . .
>
> \*          \*          \*
>
> . . . Inadequate [maternal] weight gain has been associated with elevated risk of low birthweight and preterm delivery, which are both linked to more compromised prospects for the infant's survival and health.
>
> \*          \*          \*
>
> Unmarried mothers were considerably more likely to gain less than 16 pounds, well below the standard for women of any height/weight. . . .

. . . Low [infant] birthweight, in turn, is a major predictor of infant morbidity and mortality. . . .

Low birthrate levels for nonmarital births are considerably elevated compared with marital births, 10.4 percent compared with 5.7 percent in 1992.[73]

## B. DETERMINING THE SUBSTANTIAL RELATIONSHIP TO THE IMPORTANT GOVERNMENTAL OBJECTIVE

### (1) OVERVIEW

It is not sufficient, however, that a classification simply relate to an important governmental interest. Rather, under heightened scrutiny review, the second step is to determine whether the classification is *substantially* related to the achievement of that important governmental objective.[74]

### (2) *ORR v ORR*

The *Stokely II* panel relied heavily on the United States Supreme Court case of *Orr v Orr.* As the *Stokely II* panel observed, that case involved an Alabama statute that authorized the Alabama state courts to place an alimony obligation on husbands, but not on wives.[75] The United States Supreme Court did observe that "[t]here is no question but that Mr. Orr bears a burden he would not bear were he female."[76] It is important to note, however, that the Court made

---

[73] United States Dep't of Health and Human Services, *Birth to Unmarried Mothers: United States, 1980-92*, DHHS Publication No. (PHS) 95-1931 (1995), <http://www.cdc.gov/nchs/data/series/sr 21/sr21 053.pdf> (accessed October 5, 2003).

[74] *Waterford Twp, supra* at 191.

[75] *Stokely II, supra* at 250, citing *Orr, supra* at 271.

[76] *Orr, supra* at 273.

this observation when resolving the question of Mr.
Orr's *standing*. This was *not*, therefore, the basis that
the Court used to find the Alabama statute un-
constitutional.

Rather, the Court dealt with two legislative objec-
tives that it gleaned from the opinion of the Alabama
Court of Civil Appeals, which stated that the Alabama
statutes were "designed" for the " 'wife of a broken
marriage who needs financial assistance.' "[77] The first
purpose was to "provide help for needy spouses,
using sex as a proxy for need." The second purpose
was to compensate "women for past discrimination
during marriage, which assertedly has left them
unprepared to fend for themselves in the working
world following divorce."[78] The Court concluded that
neither of these purposes, even if factually supported,
would adequately justify the salient features of Ala-
bama's statutory scheme because under the statute
"individualized hearings at which the parties' relative
financial circumstances are considered *already*
occur."[79]

The *Stokely II* panel used this language to reject
the prosecutor's argument that the challenged provi-
sion of the Paternity Act was "designed to encourage
unwed mothers to seek proper medical care."[80] The
*Stokely II* panel then stated that it "understood the
prosecutor's argument to be that the statute uses gen-
der as a proxy for need, assuming that all unwed
mothers are in need of financial assistance from the
father of their child, in order to pay for proper medi-

---

[77] *Id.* at 280, quoting *Orr v Orr*, 351 So 2d 904, 905 (Al Ct Civ App,
1977).

[78] *Id.*

[79] *Id.* at 281.

[80] *Stokely II, supra* at 250.

cal care." It is here that the *Stokely II* panel missed the mark. The only assumption implicit in the statute is that unmarried mothers will be more likely to seek appropriate medical care at the time of delivery, regardless of their financial situation, if they are not responsible for the cost of that care. The objective of the Paternity Act is, again, to ensure that minor children born outside a marriage are supported and educated. In 1956, and now, encouraging mothers to seek proper medical care is a means to that end; self-evidently, proper medical care during the confinement period before, during, and after the child's birth is an essential form of support for that child. Accordingly, in enacting subsections 2(1) and 7(2) of the Paternity Act, the Legislature was concerned with promoting the physical health of the child rather than the financial health of the mother and therefore was not using gender as a proxy for need.

Thus, when viewed from the *child's* perspective, the confinement expenses provisions of the Paternity Act do not use gender as a proxy for need. Rather, these provisions assure that the child will receive proper medical care during the mother's confinement period before, during, and after the child's birth. The fact that the circuit court has the discretion to apportion *other* expenses relating to the child's support and education does not mean that making the father solely liable for necessary confinement expenses is improper gender-based discrimination. Further, the fact that subsections 2(1) and 7(2) of the Paternity Act might operate unconstitutionally were they simply and only to operate as a proxy for need on the part of the mother is insufficient to render these provisions unconstitutional when considered in terms of their substantial relationship to the important govern-

mental objective of ensuring that minor children born outside of marriage are provided with support and education.

### (3) THE SUBSTANTIAL RELATIONSHIP

The remaining question in the equal protection analysis is, again, whether there is a substantial relationship between the Legislature's gender classification in subsections 2(1) and 7(2) of the Paternity Act and the important governmental objective of providing support for the children of unmarried parents, particularly at the critical time of birth. At the risk of stating the obvious, there are only two parties between whom the Legislature could logically allocate the cost of supporting a child born out of wedlock: the mother and the father. To encourage unmarried mothers to seek appropriate care by relieving them of the financial burden of confinement expenses, the Legislature allocated this portion of the costs of childbearing to the father. For this reason, the relationship between the gender classification at issue here and the important governmental objective is not only substantial, it is vital. Because the gender classification is substantially related to the important governmental objective of providing support for children born out of wedlock, subsections 2(1) and 7(2) of the Paternity Act do not violate the constitutional guarantee of equal protection.

### (4) THE "NECESSARIES" DOCTRINE

It is possible (although by no means certain), however, that the Paternity Act's confinement cost allocation provisions are a vestige of the common-law "necessaries" doctrine. This doctrine required a hus-

band to pay for the necessary medical services his
wife received. Here, Stokely contends that the Legis-
lature adopted the confinement cost allocation provi-
sions in order to place unmarried women on an equal
footing with married women regarding payments for
the necessary costs of confinement.[81] As the *Stokely
II* panel observed, the Michigan Supreme Court abro-
gated the common-law necessaries doctrine in *North
Ottawa Community Hosp v Kieft, supra*, on equal
protection grounds. The *Stokely II* panel then stated:

> We agree with defendant that the abrogation of the com-
> mon-law necessaries doctrine removed *any* legitimate basis
> for the Paternity Act's allocation of confinement costs on
> the basis of gender.[82]

Here again the *Stokely II* panel missed the mark.
The fact that the Court abrogated the *common-law*
necessaries doctrine does not, *ipso facto*, mean that
subsections 2(1) and 7(2) of the Paternity Act are
automatically unconstitutional. Statutes are presumed
constitutional and changes in circumstances do not,
in and of themselves, render them unconstitutional.
Certainly, the abolition of the common-law neces-
saries doctrine did not remove *any* basis for the
Paternity Act's allocation of necessary confinement
costs to the father; that conclusion is the polar oppo-
site of the "great circumspection and trepidation"
with which courts must approach constitutional
pronouncements.

Further, it is certainly arguable that the provisions
of the Paternity Act at issue here are *not* parallel to
the common-law necessaries doctrine. The neces-

---

[81] *Stokely II, supra* at 252.

[82] *Id.* (emphasis supplied).

saries doctrine existed to protect married women who were deemed to have surrendered their property rights to their husbands.[83] Unmarried women, by definition, did not face this marital disability. Further, the necessaries doctrine was, at least in part, compensatory in that it was designed to protect *married women* who surrendered their property rights to their husbands, while subsections 2(1) and 7(2) of the Paternity Act exist in order to provide support and education to *children* born out of wedlock. Therefore, while there are similarities between the necessaries doctrine and subsections 2(1) and 7(2) of the Paternity Act, it is not at all clear that these approaches are parallel in nature. Accordingly, the abrogation of the necessaries doctrine does not necessitate a finding that subsections 2(1) and 7(2) are unconstitutional.

### (5) FIA REIMBURSEMENT

According to the *Stokely II* panel, the prosecutor argued that relieving fathers of the sole responsibility for confinement costs causes an unintended consequence: unwed mothers receiving state Medicaid benefits will be required to repay the FIA for the necessary costs of their confinement. This was not, and is not, precisely the prosecutor's argument. The prosecutor contended that, if faced with potential liability for confinement expenses, expectant mothers may decide not to obtain those benefits the FIA offers, and thus forgo crucial medical care. Again, this implicates the important governmental objective of ensuring that

---

[83] See *North Ottawa, supra* at 407-408.

minor children born outside of marriage are provided with support and education.

The statutory means to this end, requiring the father to pay the mother's necessary confinement expenses, assures that the child will receive proper medical care before, during, and after that child's birth. The fact that *other* means may exist to this end does not render *this* means unconstitutional. The means the Legislature chooses to achieve a given end need not be the only means, the best means, or the perfect means, and they need not be superior to all other means. It is sufficient if these means are substantially related to that end and do not involve arbitrary or invidious distinctions.[84]

In this regard, the statutory scheme here divides liabilities incurred for the support and education of children born out of wedlock between two categories of persons: the fathers, who are responsible for the mothers' necessary confinement expenses, and the parents, who are responsible for all other support and education expenses of the child. While the first group is exclusively male, the second includes members of both sexes. The members of both sexes bear the majority of the expenses relating to the support and education of the child. All the benefits flow to the child. Such a statutory scheme is not constitutionally impermissible.[85]

## V. CONCLUSION

Perhaps the best way to determine whether the allegedly discriminatory provisions in subsections

---

[84] *Avery, supra* at 484.

[85] *Geduldig, supra* at 496 n 20.

2(1) and 7(2) of the Paternity Act are arbitrary and invidious is to ask whether the roles that these subsections assign to the mother and father of a child born out of wedlock could be reversed: could the mother be asked to pay the necessary confinement expenses that the father incurs before, during, and after the birth of that child? To ask the question is to answer it; no father will ever bear a child and no father will therefore ever be confined before, during, and after childbirth. This is an indisputable physiological fact that goes deeper than gender stereotypes; it is one of the few immutable differences between men and women. It has nothing to do with ability, merit, status, opportunity or the lack of it, patriarchy, matriarchy, sexism, or egalitarianism.

Consequently, when the Legislature concluded that most expenses for the support and education of a child born out of wedlock could be allocated on the basis of each parent's respective ability to pay, it properly granted the circuit court the discretion to make such an allocation. The Legislature recognized—as far back as 1956 and continuing into the new millennium—that there would be differences in the ability of each parent to pay for the child's support and education. It is even conceivable that the Legislature recognized that an unexpected disparity may exist between each parent's ability to pay—that a wealthy woman might give birth to the child of a poor man—and so drafted the other provisions in the Paternity Act regarding the support and education of the child to provide a street that can run in both directions.

However, with respect to the mother's necessary confinement expenses, the Legislature drew the line.

It recognized that this is a street that runs in only one direction. Only the mother will bear the physical burden of confinement before, during, and after the birth of the child. This is an immutable difference between the sexes, and the guarantee of equal protection under the law does not require things that are different in fact or opinion to be treated as though they were the same.[86]

Therefore, applying the heightened scrutiny level of review, we conclude that ensuring the support and education of children born out of wedlock is an important governmental objective. Further, we conclude that holding the father liable for the necessary confinement expenses of the mother before, during, and after the birth of a child born out of wedlock is substantially related to that objective in that proper medical care during the confinement period is an essential form of support for that child. Moreover, we conclude that making the father liable for the necessary confinement expenses assures that under all circumstances the child will receive this essential support. We therefore conclude that subsections 2(1) and 7(2) of the Paternity Act are a constitutionally permissible means to an important legislatively established end.

Reversed and remanded. We do not retain jurisdiction.

NEFF and MARKEY, JJ., concurred with WHITBECK, C.J.

WHITE, J. (*concurring*). I agree that the statutory classification is based on a real and immutable dis-

---

[86] *Jefferson, supra* at 549; *Reed, supra* at 75; *Tigner, supra* at 147.

tinction between the mother and father, and that the guarantee of equal protection does not require that things that are in fact different be treated as though they are the same. As noted in the conclusion of the lead opinion, the immutable differences between men and women have allocated the physical burden of confinement and childbirth to the mother. In light of this reality, the Legislature does not violate the equal protection guarantee by allocating the financial burden to the father.

GRIFFIN, J. (*dissenting*). I respectfully dissent. For the reasons stated in *Rose v Stokely*, 253 Mich App 236, 245-254; 655 NW2d 770 (2002), vacated in part 253 Mich App 801 (2002), I would hold that the Paternity Act's confinement cost allocation provisions, MCL 722.712(1) and MCL 722.717(2), constitute a sex-based classification that under a "heightened scrutiny" analysis violates the equal protection guarantees of the United States Constitution, US Const, Am XIV, and the Michigan Constitution, Const 1963, art 1, § 2.

For the benefit of the bench and bar, I incorporate the following portion of Judge SMOLENSKI'S well-written and reasoned opinion in *Rose, supra*,[1] that I would adopt as my own:

> Next, we must consider whether the Paternity Act's confinement expense allocation provision constitutes impermissible gender-based discrimination, in violation of the Equal Protection Clauses of the Michigan and federal constitutions. As this Court stated in the case of *In re RFF* [242 Mich App 188, 205; 617 NW2d 745 (2000)]:

---

[1] Judges SAAD and KELLY joined the unanimous opinion of the Court.

"Equal protection of the law is guaranteed by the federal and state constitutions. The Michigan and federal Equal Protection Clauses offer similar protection. Generally, equal protection requires that persons in similar circumstances be treated similarly. '[I]t is well established that even if a law treats groups of people differently, it will not necessarily violate the guarantee of equal protection.' Neither constitution has been interpreted to require absolute equality. When legislation is challenged as violative of the equal protection guarantee under either constitution, it is subjected to judicial scrutiny to determine whether the goals of the legislation justify the differential treatment it authorizes. The level of scrutiny applied depends on the type of classification created by the statute and the nature of the interest affected by the classification." [Citations omitted.]

"When a party raises a viable equal protection challenge, the court is required to apply one of three traditional levels of review, depending on the nature of the alleged classification." *Crego v Coleman*, 463 Mich 248, 259; 615 NW2d 218 (2000). The most stringent level of review, referred to as "strict scrutiny," is applied "where the law results in classifications based on 'suspect' factors such as race, national origin, or ethnicity . . . ." *Id.*, citing *Plyler v Doe*, 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982). An intermediate level of review, referred to as "heightened scrutiny," is applied where the law results in classifications based on factors such as illegitimacy and gender. *Crego, supra* at 260, citing *Clark v Jeter*, 486 US 456, 461; 108 S Ct 1910; 100 L Ed 2d 465 (1988). The most deferential level of review, referred to as "rational basis," is applied where the law does not result in classifications based on impermissible factors. *Crego, supra* at 259, 261.

## A. CLASSIFICATION BASED ON GENDER

In order to resolve defendant's equal protection claim, we must first determine whether the confinement expense allocation provisions contained in MCL 722.712(1) and MCL 722.717(2) create a classification based on gender. . . . [W]e

would hold that the statutory language does create a classification based on gender.

*     *     *

. . . Subsection 2(1) clearly provides that the father of a child born out of wedlock is liable for the mother's confinement expenses. The statute does not make the mother and the father jointly liable for these expenses, and does not grant a circuit court discretion to allocate those expenses on the basis of the parties' respective abilities to pay. As in *Orr v Orr*, 440 US 268, 273; 99 S Ct 1102; 59 L Ed 2d 306 (1979), there is no question that defendant "bears a burden he would not bear were he female." By authorizing the imposition of confinement expenses solely on fathers, but not on mothers, the Paternity Act provides that different treatment be accorded on the basis of gender; it thus establishes a classification subject to intermediate scrutiny under the Equal Protection Clauses of the Michigan and federal constitutions. See *id.* at 278-279.

### B. INTERMEDIATE SCRUTINY

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." *Frontiero v Richardson*, 411 US 677, 684; 93 S Ct 1764; 36 L Ed 2d 583 (1973). Legislatively drawn classifications based on gender are often an "accidental byproduct of a traditional way of thinking about females that reflected old notions and archaic and overbroad generalizations about the roles and relative abilities of men and women." *Heckler v Mathews*, 465 US 728, 745; 104 S Ct 1387; 79 L Ed 2d 646 (1984). This traditional way of thinking has changed over time, and females are no longer considered to be "destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." *Stanton v Stanton*, 421 US 7, 14-15; 95 S Ct 1373; 43 L Ed 2d 688

(1975). Because "[l]egislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the 'proper place' of women and their need for special protection," such classifications will be upheld only if they "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Orr, supra* at 279, 283.

Here, the prosecutor argues that the Paternity Act's confinement cost allocation provision is substantially related to the achievement of an important governmental objective. Specifically, the prosecutor argues that the statutory provision was designed to encourage unwed mothers to seek proper medical care. The prosecutor contends that unwed mothers might forgo needed medical care unless they are assured that they will not be held liable for the expense of such care. In essence, we understand the prosecutor's argument to be that the statute uses gender as a proxy for need, assuming that all unwed mothers are in need of financial assistance from the father of their child, in order to pay for proper medical care.

The United States Supreme Court rejected a similar argument in *Orr, supra*. In *Orr*, the Court examined an Alabama statute that authorized state courts to place an alimony obligation on husbands, but never on wives. *Orr, supra* at 271. Alabama's intermediate appellate court concluded that the statute was designed for " 'the wife of a broken marriage who needs financial assistance.' " *Id.* at 280. Thus, the stated legislative purpose for the gender-based classification was to "provide help for needy spouses, using sex as a proxy for need." *Id.* The United States Supreme Court held in *Orr* that the statute in question violated the Equal Protection Clause because Alabama's statutory scheme already permitted "individualized hearings at which the parties' relative financial circumstances are considered . . . . " *Id.* at 281. Thus, there was no reason to use gender as a proxy for need, and this rationale was inadequate to justify the statute's gender-based classification. *Id.* at 281-282.

Likewise, under our Paternity Act, circuit courts already conduct individualized hearings to examine the parties' rela-

tive financial circumstances. Indeed, such hearings must be conducted before a trial court can enter an order of filiation specifying the unmarried parents' respective child support obligations. MCL 722.717(2). We recognize that only mothers undergo confinement and childbirth, while fathers do not. However, it is not true that all mothers, or even all unwed mothers, are unable to afford costs associated with confinement and childbirth. Because individualized hearings can determine which unwed mothers are in need of financial assistance from the father of their child, the statutory purpose advanced by the prosecutor can be effectuated without placing the burden of confinement costs solely on fathers. *Orr, supra* at 281-282.

Defendant argues that the Paternity Act's confinement cost allocation provision is a lingering vestige of the common-law "necessaries" doctrine, which required husbands to pay for the necessary medical services received by their wives. Defendant contends that the Legislature adopted this provision of the Paternity Act in order to place unmarried women on an equal footing with married women, regarding payment for the necessary costs of confinement. While the necessaries doctrine remained in force, the fathers of children borne [sic] to married women (i.e., their husbands) were automatically liable for the necessary medical costs incurred during childbirth. The Paternity Act's confinement cost allocation provision gave unmarried women the same advantage, requiring the fathers of their children to be entirely liable for their necessary medical costs incurred during childbirth.

The common-law necessaries doctrine remained unmodified until just four short years ago, when our Supreme Court recognized that the doctrine violated equal protection principles. *North Ottawa Community Hosp v Kieft*, 457 Mich 394; 578 NW2d 267 (1998). In that case, our Supreme Court abrogated the common-law necessaries doctrine, stating:

"[T]he common-law necessaries doctrine imposing the support burden only on a husband could be justified in the past because it was substantially related to the important governmental objective of providing necessary support to

dependent wives. However, the contemporary reality of women owning property, working outside the home, and otherwise contributing to their own economic support calls for the abrogation of this sex-discriminatory doctrine from early common law." [*Id.* at 407-408.]

We agree with defendant that the abrogation of the common-law necessaries doctrine removed any legitimate basis for the Paternity Act's allocation of confinement costs on the basis of gender.

The prosecutor's appeal brief can also be read to advance another purpose for the Paternity Act's gender-based classification. The prosecutor argues that the [Family Independence Agency] pays the confinement expenses of unwed mothers who are entitled to state Medicaid benefits, and that the Legislature intended to permit recoupment of these expenses from the fathers of children born out of wedlock. This argument relies on a crucial, but mistaken assumption: that the Paternity Act's confinement expense allocation provision applies only to unwed mothers receiving government assistance. The Paternity Act is not so limited; the statute applies to *all unwed mothers*, regardless of their financial status. Not all unwed mothers need financial assistance from the father of their child in order to pay for proper medical care. Many women, wed and unwed, are covered by their own health care insurance and are otherwise equally able to pay for the birth of their children.

The prosecutor's argument also implies that relieving fathers of sole responsibility for confinement costs regarding the birth of illegitimate children will result in an unintended consequence: unwed mothers receiving state welfare benefits will be required to repay the FIA for the necessary costs of their confinement. We stress that the issue before us is not whether the mother of a child born out of wedlock should or may be required to repay the FIA for her necessary confinement expenses. The issue before us is whether the father of a child born out of wedlock may properly be required to shoulder the entire burden of the mother's confinement expenses. Although we concede that recoupment of confinement expenses from fathers who have the ability to pay such expenses constitutes an important governmen-

tal objective, this purpose can be achieved by gender-neutral legislation. [*Rose, supra* at 245-254 (emphasis in original).]

The lead opinion by Chief Judge WHITBECK correctly concludes that "[t]he objective of the Paternity Act is, . . . to ensure that minor children born outside a marriage are supported and educated." *Ante* at 311. To achieve this end for all financial burdens except confinement expenses, the act grants the circuit court discretion to apportion the expenses of parenthood between the father and the mother in a fair and equitable manner for the best interests of the child. However, in regard to confinement expenses only, the statute affords no discretion in the interest of the child and instead directs that "[t]he father is liable to pay [one hundred percent of] the expenses of the mother's confinement . . . ." MCL 722.712(1). Chief Judge WHITBECK would hold that this sex-based classification is substantially related to the important governmental objective of ensuring that a child born out of wedlock receive support. In the words of the lead opinion: "making the father liable for the necessary confinement expenses assures that under all circumstances [whether the mother is "needy" or not] the child will receive this essential support."[2] *Ante,* at 317.

---

[2] This appears to be a ruling from a different era. As the *Orr* Court stated in holding that Alabama's statutory scheme of imposing alimony obligations on husbands but not on wives violates the constitutional guarantee to equal protection of the law:

*Stanton v. Stanton,* 421 U.S. 7, 10 [95 S Ct 1373; 43 L Ed 2d 688 1373] (1975), held that the "old [notion]" that "generally it is the man's primary responsibility to provide a home and its essentials," can no longer justify a statute that discriminates on the basis of gender. "No longer is the female destined solely for the home and

I respectfully disagree. As emphasized by the United States Supreme Court in *Orr, supra* at 283, gender-based statutory distinctions often reinforce unfair stereotypes between the sexes and thus impede the furtherance of equal protection for women:

> Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the "proper place" of women and their need for special protection. Cf. *United Jewish Organizations v. Carey*, 430 US 144, 173-174 [97 S Ct 996; 51 L Ed 2d 229 ] (1977) (opinion concurring in part). Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the state's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex.

Furthermore, as noted by the Michigan Supreme Court in *Crego, supra* at 258-259, quoting with approval *Avery v Midland Co, Texas*, 390 US 474, 484; 88 S Ct 1114; 20 L Ed 2d 45 (1968), the coextensive equal protection guarantees of the United States and Michigan constitutions[3] prohibit the state from treating persons differently on the basis of "arbitrary or invidious" distinctions:

> The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment. *Miller v Johnson*, 515 US 900, 919; 115 S Ct

---

the rearing of the family, and only the male for the marketplace and the world of ideas," *id.*, at 14-15. [*Orr, supra* at 279-280.]

[3] *Harvey v Michigan*, 469 Mich 1; 664 NW2d 767 (2003).

2475; 132 L Ed 2d 762 (1995); *El Souri v Dep't of Social Services*, 429 Mich 203, 207; 414 NW2d 679 (1987). Conversely, the Equal Protection Clauses do not prohibit disparate treatment with respect to individuals on account of other, presumably more genuinely differentiating, characteristics. *Puget Sound Power & Light Co v City of Seattle*, 291 US 619; 54 S Ct 542; 78 L Ed 1025 (1934). Moreover, even where the Equal Protection Clauses are implicated, they do not go so far as to prohibit the state from distinguishing between persons, but merely require that "the distinctions that are made not be arbitrary or invidious." *Avery v Midland Co, Texas*, 390 US 474, 484; 88 S Ct 1114; 20 L Ed 2d 45 (1968).

Although raised in the context of an argument alleging a violation of due process, amicus curiae Family Law Section of the State Bar of Michigan argues that the statutory mandate of liability for confinement expenses is so arbitrary that it is unconstitutional:

MCL 722.712(1) creates an irrebuttable presumption that in all cases the father is the appropriate parent to pay for all of the mother's confinement expenses. The due process clause forbids the application of an irrebuttable presumption that impinges on a fundamental liberty interest, when that presumption is not necessarily or universally true in fact, and where the state has reasonable alternative means of making a determination. *Vlandis v Kline*, 412 U.S. 441, 452 [93 S Ct 2230; 37 L Ed 2d 63] (1973), *Stanley v Illinois*, 405 U.S. 645 [92 S Ct 1208; 31 L Ed 2d 551] (1972).

It is not necessarily or universally true that fathers are more financially able than mothers to pay for confinement expenses. The state has a reasonable alternative means of making a determination of apportionment of confinement expenses. The policy of the State of Michigan, as evidenced by the Michigan Child Support Formula, is that both parents should share the costs of raising their children in accordance with their relative earnings. The information necessary to apportion confinement expenses is available to

the court when it calculates child support during proceedings under the Paternity Act. A system that irrebuttably presumes that fathers have the greater ability to pay the mother's confinement expenses violates the due process clauses of the state and Federal Constitutions.

In the present case, the parties have not raised or preserved an issue alleging violation of due process. Nevertheless, the arbitrariness of the sex-based classification is relevant in determining whether the statute passes constitutional muster under a heightened scrutiny, equal protection analysis. *Crego, supra; Avery, supra.*

In my view, the interest of the child in obtaining necessary support is not substantially furthered by the arbitrary and inflexible rule of liability for confinement expenses based solely on a parent's sex. As with other parenthood expenses, a fair and equitable apportionment between the father and the mother in the best interests of the child is the standard that substantially furthers the governmental objective at issue. The arbitrary mandate based solely on a parent's sex is not substantially related to an important governmental objective. *Orr, supra.* Because the statutory sex-based classification fails to withstand the intermediate scrutiny required under our federal and state guarantees of equal protection under the law, I would hold MCL 722.712(1) and MCL 722.717(2) to be unconstitutional in regard to the parental financial responsibility for confinement expenses. I would affirm the fair and equitable apportionment of the confinement expenses ordered by the trial court.

METER and COOPER, JJ., concurred with GRIFFIN, J.